JOSSLINE FAUSTIN, A/K/A JOSSELINE LEWIS, PLAINTIFF-APPELLANT, v. MAURICE LEWIS, A/K/A MAURICE RILEY AND JAMES OSCAR LEWIS, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted January 28, 1980—Decided February 26, 1980.

Before Judges SEIDMAN, MICHELS and DEVINE.

*W. Marshall Prettyman,* Essex-Newark Legal Services, attorney for appellant.

No brief was submitted on behalf of respondent.

The opinion of the court was delivered by

MICHELS, J. A. D.

Plaintiff Jossline Faustin, who is also known as Josseline Lewis, appeals from a judgment of the Chancery Division dismissing her complaint for annulment of her marriage to defendant Maurice Lewis on the ground that the action is barred by the equitable doctrine of unclean hands.

The stipulated facts appear in the complaint. On November 24, 1974 plaintiff a Haitian citizen, who was in the United States by virtue of a temporary visitor's visa, participated in a marriage ceremony with defendant. Defendant was employed by persons who were engaged in the unlawful business of arranging marriages between United States citizens and illegal Haitian aliens so that the latter could obtain lawful permanent residence in the United States. Defendant, using a false name, married plaintiff for that purpose, just as he had married other Haitian aliens to enable them to become permanent residents of this country. The marriage ceremony was performed in Newark, New Jersey, by a Reverend Heber Brown, who is also known as J. C. Smith. Plaintiff participated in the ceremony solely for the purpose of obtaining an immigrant's visa which could permit her to become a lawful permanent resident of the United States. According to the complaint, plaintiff never resided with defendant at any time following the marriage ceremony, and no children were born to her as a result of her so-called marriage to defendant.

On June 9, 1977 defendant and several others were indicted by the United States grand jury in and for the District of New Jersey, and charged with unlawfully assisting illegal Haitian aliens to fraudulently obtain lawful permanent residence in the United States in violation of the immigration and naturalization laws of the United States. One of the charges set forth in the indictment specifically referred to plaintiff's marriage to defendant. Reverend Brown was named in the indictment as an unindicted coconspirator.

On February 22, 1978, more than three years after participating in the marriage ceremony, plaintiff instituted this action seeking an annulment of her marriage to defendant on the ground of fraud. See *N.J.S.A.* 2A:34 1(d). Defendant failed to file an answer to the complaint and thereafter a default was entered against him. At the final hearing plaintiff stipulated that if she were to testify, her testimony would essentially recount the facts set forth in the complaint. She did, however, specifically admit "that she knew about the scheme before she entered into the marriage" and that she entered into the marriage solely for the purpose of evading the immigration and naturalization laws of the United States. Following argument, Judge Strelecki in the Chancery Division found that plaintiff had participated in an unlawful scheme to become a citizen of the United States and therefore was precluded from obtaining an annulment by virtue of the equitable doctrine of unclean hands.

Plaintiff appeals, contending essentially that the doctrine of unclean hands, which was abolished as a defense to divorce by the Divorce Reform Act of 1971 (*L.*1971, *c.* 212, § 4; *N.J.S.A.* 2A:34 7) should be abolished as a defense to annulment. She claims that the Legislature's failure to abolish the doctrine with respect to actions for annulment was the result of "legislative oversight." We disagree. The legislative intent to preserve the doctrine is abundantly clear. The Legislature did not expressly or impliedly abolish the clean hands doctrine as a defense to annulment. It simply abolished the doctrine as a

defense to divorce from the bonds of matrimony and to divorce from bed and board. *N.J.S.A.* 2A:34-7. It is well settled that an intent to change a longstanding rule or principle is not to be imputed to the Legislature in the absence of a clear manifestation thereof. *Elberon Bathing Co. v. Ambassador Ins. Co.*, 77 *N.J.* 1, 18 (1978); *State v. Western Union Tel. Co.*, 12 *N.J.* 468, 486 (1953). The *Final Report to the Governor and the Legislature* (May 11, 1970) of the Divorce Law Study Commission (created by the Legislature to study and review the statutes and court decisions concerning divorce and nullity of marriage, particularly as contained in *Title* 2A of the *New Jersey Statutes*, and report its findings accompanied with any bills recommended for adoption by the Legislature, *L.*1967, *c.* 57, as amended), dispels any notion that the legislative intent was to abolish the longstanding unclean hands doctrine enunciated in *Tyll v. Keller*, 94 *N.J.Eq.* 426, 428-429 (E. & A. 1923). The 1971 revision of our statutes controlling marital relationships was enacted pursuant to the Commission's recommendations, and consequently, the Commission's final report may properly be considered in ascertaining the legislative intent. *See State v. Genova*, 77 *Wis.*2d 141, 252 *N.W.*2d 380, 385 (Sup.Ct.1977); 2A *Sutherland, Statutory Construction* (4 ed., Sands 1973), §§ 48.07 and 48.09 at 206–209. *See, also, State v. Madden*, 61 *N.J.* 377, 389 (1972); *Matawan v. Monmouth Cty. Tax Bd.*, 51 *N.J.* 291, 299 300 (1968). While the Commission recommended the adoption of legislation abolishing the unclean hands doctrine as a defense to divorce (*Final Report* to the *Governor, supra*, at 80 85), it did not propose legislation to abolish the doctrine with respect to annulment. On the contrary, the Commission intended to preserve the substance of the existing law and the general equity jurisdiction of the court with respect to annulments. Thus, while proposing some change in former *N.J.S.A.* 2A:34 1, dealing with causes for judgments of nullity, the Commission left intact former subsection (g) (now subsection (f)), which provides that "Judgments of nullity of marriage may be rendered in all

cases, when . . . [a]llowable under the general equity jurisdiction of the Superior Court." The Commission's comments read as follows:

> The above revision of the current provisions leaves intact the substance of the existing law but eliminates present subsection d. and the remainder of the statute, substituting in lieu thereof the underlined sub-section.
>
> The major recommended change is to provide in subsection d. for those grounds for annulment within the current general equity jurisdiction of the Superior Court so that they clearly appear in the statute. Although present subsection g. makes express reference to such general equity jurisdiction there is no statutory indication as to what is involved. It is highly desirable to specify *all* grounds for nullity judgments in the statute. No attempt is made to limit such equity jurisdiction. Rather, the aim is to describe it in familiar terms. *Want of understanding* may be due to mental condition (insanity), or intoxication (liquor, drugs, etc.) In rare cases, one party may not have known the nature of the ceremony or may have thought it was a hoax. Fraud and duress are the other examples of a lack of consent to marriage. In accordance with equitable principles, the proposed ground is not available if the error is ratified.
>
> . . . . . . . . . .
>
> The above revision is an effort to preserve existing law without any major change in policy but at the same time to adapt it to other recommended changes. The only innovation is to set forth in more specific form the present reference to general equity jurisdiction. [*Final Report* to the *Governor, supra,* at 59-60]

We therefore have no hesitancy in concluding that our Legislature did not abolish the unclean hands doctrine as a defense to annulment. In our view, the doctrine still remains. *See Callaghan v. Leonard,* 159 *N.J.Super.* 149, 152 153 (Ch.Div.1978); *Ramshardt v. Ballardini,* 129 *N.J.Super.* 445, 447 (Ch.Div.1974); *Hansen v. Fredo,* 123 *N.J.Super.* 388, 390 391 (Ch.Div.1973). See, also, *Skoloff, New Jersey Family Law Practice,* "Annulments" (3 ed. 1976), § 2 at 132.

Finally, we are satisfied that the trial court properly invoked the doctrine in the circumstances of this case. As noted in *Untermann v. Untermann,* 19 *N.J.* 507 (1955):

The method of application of the doctrine is clearly and concisely stated by Mr. Justice Trenchard in *Neubeck v. Neubeck*, 94 *N.J.Eq.* 167, at page 170, 27 *A.L.R.* 172 (E. & A. 1922), when he said:

"While the maxim, 'He who comes into equity must come with clean hands,' has a very wide application, it has also its limitations. It does not repel all sinners from courts of equity, nor does it apply to every unconscientious act or inequitable conduct on the part of the complainants. The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act of the defendant which the complaining party states as his ground or cause of action, but it must be evil practice or wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought. *Pendleton v. Gondolf*, 85 *N.J.Eg.* 308, and cases collected in 21 *C.J.* 182, and 10 *R.C.L.* 391. A recent illustration of the proper application of the doctrine is to be found in *Prindiville v. Johnson & Higgins*, 93 *N.J.Eq.* 425."

The rule is not an arbitrary rule and calls for the exercise of just discretion on the part of the court. *White v. White*, 16 *N.J.* 458, 464 (1954); *Medical Fabrics Co. v. D. C. McLintock*, 12 *N.J.Super.* 177, 180 (App.Div.1951).

*It is the effect of the inequitable conduct on the total transaction which is determinative whether the maxim shall or shall not be applied. Facades of the problem should not be examined piecemeal. Where fraudulent conduct vitiates in important particulars the situation in respect to which judicial redress is sought, a court should not hesitate to apply the maxim.* [at 517-518; emphasis added].

Plaintiff knowingly and wilfully participated in an unlawful scheme to obtain an immigrant's visa so that she could become a lawful permanent resident of this country. Plaintiff's intentional violation of the immigration and naturalization laws of the United States precludes her from obtaining relief in our courts. The application of the doctrine of unclean hands as a bar to an annulment in the circumstances of this case serves to preserve the interests of justice and the integrity of the courts.

Moreover, contrary to plaintiff's claim, we do not view *Kazin v. Kazin*, 81 *N.J.* 85 (1979), which was decided while this appeal was pending, as abolishing the doctrine of unclean hands as a defense to annulment. In *Kazin* plaintiff, who was separated

from her first husband, was induced by defendant second husband to obtain a Mexican divorce. Following that divorce plaintiff and defendant married and lived together for seven years, apparently believing themselves to be husband and wife. When plaintiff sued for divorce and, alternatively, for separate maintenance, defendant sought to attack the validity of plaintiff's prior Mexican divorce and to repudiate the obligations which he assumed by marrying plaintiff. The trial judge, deeming himself bound by *Tonti v. Chadwick*, 1 *N.J.* 531 (1949), which involved the same question under comparable circumstances, denied plaintiff relief. We were constrained to affirm. 161 *N.J.Super.* 174, 186 (App.Div.1978). On appeal the Supreme Court, in reversing the judgment, rejected its prior reasoning in *Tonti* and stated:

> . . . It would, in our view, be contrary to the public policy reflected in our current laws to permit defendant under these circumstances to attack the validity of his wife's prior Mexican divorce and to repudiate the obligations which he assumed in marrying plaintiff. To that end, he is estopped [from asserting] these particular defenses to plaintiff's marital claims. [*Kazin, supra*, 81 *N.J.* at 98–99]

Here we are simply dealing with an action to annul a ceremonial but fraudulent marriage. Plaintiff did not participate in the marriage ceremony with the intent to assent to a marital relationship. Additionally, following the ceremony plaintiff never lived with defendant and no children were born to her as a result of her so-called marriage to defendant. In fact, none of the incidents usually attendant a marriage relationship were present. Plaintiff deliberately and intentionally participated in the fraudulent marriage solely to obtain the status of a lawful permanent resident of this country. Hence, not only is *Kazin* factually distinguishable, but more importantly, the principles enunciated therein do not support a result contrary to the one reached here.

Accordingly, the judgment below is affirmed.